Good morning, Your Honors. Vince Branco, Federal Defenders, on behalf of Mr. Sanchez. Mr. Sanchez's conviction must be reversed because the government did not have sufficient evidence to show that Mr. Sanchez was the individual that was apprehended at primary inspection, and second, because the government failed to disclose braiding material regarding one of its key witnesses. As to the sufficiency claim, there's no dispute here that the primary inspector, Agent Santana, could not identify Mr. Sanchez as the person that came to the port of entry on the day in question, and this is significant because he had a lot of contact with Mr. Sanchez. How long a period was it between the time of the incident and the time that Mr. Santana was asked to identify him as part of the legal proceedings? I believe it's approximately four months. Okay. And it happened twice. There was a motion hearing where Agent Santana couldn't identify Mr. Sanchez, and then it happened, obviously, again at trial. And I think that's significant in this case because what the government's relying on here is what they call a link between Agent Santana and then the, basically, I think they call it a prosecuting agent that happened even after Mr. Sanchez was in the secondary. And that falls apart. The timing here is somewhat questionable. Agent Santana basically testified that sometime, and the question was at about 11.10 that evening, close to midnight, did an individual approach. So Agent Santana's timeframe is somewhere around 11.10 to somewhere close to midnight. It's a compound question. You're not sure exactly the exact timing from Agent Santana. Agent Woodington was asked, a little bit after midnight, was a person referred to processing who had been detained by Officer Santana? His answer was, yes, it was a little after midnight. Later on, Agent Woodington is asked a series of questions regarding this biographical form that he was reviewing while he was processing Mr. Sanchez. And that showed that the actual time that the search in secondary of Mr. Sanchez was between 11.10 and 11.12. And it was by officers. And this form is supposed to contain also the primary inspector. And he was asked to name all the agents involved. And it was all agents that were not Agent Santana. So there's a key missing element of the link of, well, how did this person get to Woodington? And exactly what time did Mr. Sanchez get into secondary? It's just not, well, it's clear what time he did. It's not clear exactly what time Agent Santana referred the person he saw. But when you really look at it, Agent Santana had time to see who he was, who was there. He had a conversation with him. And he remembered very detailed accounts that when the person came up, he volunteered U.S. citizen rather than being asked, that he wasn't slurring, that he didn't smell of alcohol, that he didn't have any signs of drunkenness. And he also had a long time to do this during the conversation and during a physical escort to the secondary office. And basically what it comes down to is when the government has their primary inspector, that in court is asked, is that, do you know if that's the person? And they say, I don't know. They need to actually fill in the gaps. Meaning have an agent from the secondary inspector say, yes, I saw Agent Santana walk him over and he is with Mr. Sanchez. But the issue at this point after a conviction is, was there enough evidence in front of the jury from which the jury could conclude that this is the guy? I understand that we've got a serious issue because Mr. Santana can't do the identification. But there's other evidence in the record from which the jury could conclude that Mr. Santana is the person described and that, excuse me, that Mr. Sanchez is the person described and that Mr. Santana's testimony is correct. I mean, it's up to the jury to decide. But at this point, that's not quite our question as to whether or not it was Mr. Sanchez. The question is whether the jury had enough evidence. Isn't that right? That is. But the exact question is whether or not a rational juror could conclude this beyond a reasonable doubt. Yeah, right. And it's kind of like some of the bank cases, the insurance. There have been cases that this court has said, like when I think when there's a proof of insurance about five, ten years before, but then they don't prove that it was insured at the time. Yeah, that's some evidence that the bank was insured because it was five years before. But that's not sufficient evidence. And I think that's what you have here. There's some evidence that Mr. Sanchez was in secondary around this time. But there's not evidence that this was the enough evidence to conclude beyond a reasonable doubt that he was the person. Although those bank cases are funny cases. When I first ran into them, I was totally astounded. But I think the explanation for those bank cases is if the bank was insured during the relevant period, it's very clear that there will be documentation of that fact. And if the government doesn't produce documents, well, okay, you didn't produce documents that were readily available to you, you lose. Well, here, it's not like yes or no. Their documents were dependent upon the ordinary frailties of human beings, what they remember, what they don't remember, and so on. Actually, Your Honor, I disagree because there is a document in this case, and it was in evidence. And that document had the names of the secondary inspectors that took over the search of Mr. Sanchez. So, yes, the government had the person in their file to go to, and they had time to do this because they knew this was a problem from the motion hearing, and didn't call them to testify and say, yes, Inspector Santana brought him into secondary. They had the information. They didn't bring it. I think the same inference is there. Because they didn't do it, there's a gap. All right. Turning briefly, since I don't have much time, to the Brady violation. First of all, the fact that John Torres was under investigation, I think, is clear. There's an indictment that we submitted in the Excerpt of Record, and there's various news reports saying that he was involved in a conflict of interest, and he was being at the time he testified. And was this public knowledge at this time? I think it was, right? When you were referring to news reports, right? So if you read the newspaper, you knew this. We knew it, I believe it's one or two months after the notice of appeal was filed, was the first time John Torres was named. He was indicted afterwards, and these news reports, to my knowledge, all came after the notice of appeal was filed. And that's why we're here instead of in the district court. And that's exactly the, to be clear, the remedy we're asking for is it's clear right now there's a problem. We just want a remand to the district court to find out exactly what this U.S. Attorney's Office knew, what was the extent of John Torres' involvement, were there any promises made based on this other investigation. Just a remand, which this court has done before in the case of Blanco, when there's an obvious problem, remand to the district court to find out if there was the extent of the violation and what remedy should be imposed. I want to make sure I understand. I understand what the harm here is, what the prejudice is to your client. Mr. Torres did not do the initial print. That was done by Officer Woodington. Is that correct? Correct. So all Torres is doing is coming into trial and saying, I've looked at these prints. These prints match. So he's sort of corroborating what Woodington has already said. Is that right? There's a much bigger problem here. To prove the physical deportation, they used warrants of deportations from 1992 and 1993, and that's what shows that Mr. Sanchez was actually deported. So we're comparing a prior fingerprint to the fingerprint taken by Officer Woodington. Torres provided, and the only witness that provided the connection between Mr. Sanchez, who was on trial, and the person that was deported back in 1992 and 1993. Both the witnesses that executed those warranted deportations were called, but they could not identify Mr. Sanchez. So that is the prejudice. He was their sole link to one of the elements of the offense. All right. Good morning, Your Honors. My name is Jason Forge. I'm here on behalf of the United States. Your Honor, I'd like to pick up right where Judge Bybee left off, talking about the alleged Brady violation. Defense counsel is correct that Mr. Torres connected the link between Mr. Sanchez and the same Mr. Sanchez who had been deported over a decade earlier. But when we're looking at an alleged Brady violation and we're asking whether or not there's a reasonable probability the outcome at trial would have been different if alleged information would have been made available to the defense, we need to look at the entire trial. And when we do that, you see that Mr. Sanchez himself testified. Mr. Sanchez himself admitted that he is a citizen of Mexico. He admitted that he had no legal right to reenter the United States. Did he admit that he had two priors? He admitted that he had been deported before, yes. And specifically, Your Honors, if you look at excerpt from record page 291, he makes all these admissions. Been deported in 1993. Citizen of Mexico. No legal permission to enter the United States and not allowed to come back to the United States. All of these admissions. That just wasn't the defense in this case was not, hey, I was never deported before. They conceded that. The defense in this case was, hey, somebody grabbed me and pulled me into the pedestrian booth and started processing me. Aside from the question of whether the government has proven its affirmative case, did the defense offer any counter evidence to show that the 1992 and 1993 fingerprints were not Mr. Sanchez's fingerprints? Do we have a conflicting expert who comes in and says, Mr. Torres is wrong. These two prints don't match. Absolutely not. And when you look at the cross-examination of Mr. Torres, there was no challenge whatsoever to the accuracy of his conclusion. But I would like to turn to the other. Why wasn't this Brady material disclosed? Judge Ferguson, I appreciate you asking that question because this purported Brady material. I ask it because we see a lot of cases like this where Brady materials withheld. Your Honor, this is not one of those cases. Well, how do we know that? You know it because the citations that Mr. Sanchez has in his brief falsely attribute the claim that there was a Federal investigation pending at the time of this trial to two newspaper articles and specifically, Your Honors, I'm referring to page 18 of Mr. Sanchez's opening brief. This is, I'm quoting here. Additionally, the Federal Bureau of Investigation, the Securities and Exchange Commission and the Office of the United States Attorney of San Diego have been investigating Mr. Torres and his co-defendants for potential securities violations and fraud since at least February of 2004. They cite two newspaper articles for that proposition. The first is titled Timeline, Pension Troubles, San Diego Union Tribune, May 18, 2005. I have that article, Your Honors. I'm sure Your Honors will have the opportunity, your clerks can pull it. Nowhere in this article does it support the proposition for which the defendant cites it. Nowhere. In fact, in this timeline, it says that the district attorney didn't even begin her investigation until 2005 after the trial of this case concluded. The second article, and these are the only two authorities, defendants cite for that proposition and the entire Brady claim is based on that proposition. Two authorities. This article, which doesn't support it, and the next, see also, Tony Perry, titled Municipal Pension Board Members Face Charges, Los Angeles Times, May 17, 2005. Now this one took me a while to dig up, Your Honors, because it's miscited. There is no article by Tony Perry on May 17, 2005, with that title. The only Tony Perry article on May 17, 2005 is entitled Three San Diego City Officials Quit After Deficit Fuhrer. Nowhere in that article does it support Mr. Sanchez's proposition. Nowhere. The other article by Tony Perry around the same timeframe is on May 18, 2005. It is titled First Charges Filed in San Diego Pension Case, Six City Employees on the Benefits Board are Accused of Voting for Changes that Boosted Their Own Retirements. Once again, nowhere in this article does it say that the Federal Bureau of Investigation, the Securities and Exchange Commission, and the Office of the United States Attorney in San Diego have been investigating Mr. Torres and his co-defendants for potential securities violations and fraud since at least February of 2004. Nowhere. Your Honors, if there is any issue here, it should be the subject of Rule 2255 motion. On this issue, I think it is clear the Court should affirm with an invitation to file Rule 2255 motion. But Mr. Sanchez has not even taken the first step to show a potential Brady violation. And as I pointed out at the beginning of my argument, he clearly can't make the second step of showing prejudice, because there is no reasonable probability that the outcome here would have been different. I'd like to go back to Judge Fletcher's point regarding the sufficiency of the evidence here, because it's a good one. And we have a very high standard when the challenge on appeal is sufficiency of the evidence. Is this a case where it's ironclad and it's irrefutable? No. But that's not the standard. The standard is when we draw all reasonable inferences in favor of the government, could any rational trier of fact find all of the elements here beyond a reasonable doubt? Clearly, the answer is yes. There wasn't ambiguity other than an approximate time from what Agent Santana said. On page 199 of the excerpt of record, Agent Santana said that he had a brief encounter with Mr. Sanchez, and he walked him to secondary where he would be searched. 1110 it started. It was brief. He walked him to secondary. Officer Woodington testified. It was brief, but he sure remembers a lot of detail. Well, that's another interesting point. It's weird, actually, I have to say. He remembers a lot of detail about he was drinking, not drinking, so on and so on. My guess is that he remembers this detail because he's reading his report, not because he remembers it independently. Well, that's possible. He did say he once his memory was refreshed, he did have an independent. I understand. I understand your point. But the fact that he couldn't identify Mr. Santana is consistent. He couldn't. It doesn't mean that there was somebody else, because he couldn't remember any of the facial features of the person. So it's not as if he thought that, oh, it was somebody with blonde hair and it was really somebody with dark hair. He couldn't remember the facial features. But the fact that he couldn't remember any facial features and the fact that he didn't discuss anybody else being present or taken to secondary that time frame, and the fact that Officer Woodington, even on cross-examination, didn't mention anyone else being processed for prosecution that evening, all contribute to an inference that could be drawn in favor of the government, as we must, given his posture, that he was the only person being processed at that time, Sunday night, on that day. That alone would be sufficient to support what essentially is a chain of custody challenge regarding Mr. Sanchez. In addition, the times do link up extremely well. 11-10, he has a brief encounter. He walks Mr. Sanchez over to secondary. For search, in order for him to be searched. Officer Woodington testifies that the individual whom he identified as Mr. Sanchez, whom he processed for prosecution, was in fact searched in secondary at 11-12 p.m. Same date, almost the exact same time Officer Santana recalls walking Mr. Sanchez over to secondary. So again, is it ironclad? No. But on those points alone, the lack of any other individual being mentioned as being processed for prosecution or being detained or being arrested, and the very close proximity in time, on those points alone, there are sufficient reasonable inferences to be drawn to support the conviction in this case on that issue. In other words, I see my time is up. I'm happy to answer any questions any of you have. If not, I'll submit. All right. Thank you. We've got 35 seconds, but I'll give you a minute. As to the Brady claim and the actual newspaper article citing, I apologize. I did not write this brief, and I did not check those sites. But what is clear is that Mr. Torres was formally charged in the state of California in May. He testified in November, and this U.S. Department of Justice said that he was under investigation at the time of his testimony. They just came up and gave a big presentation how these two articles don't show that he was under investigation. But they didn't deny that they were investigating him. In fact, I believe over the last month or two, they have indicted people regarding the same offenses in Federal court. What do you do with the fact that when Mr. Sanchez testified that he admitted that he had prior deportations? One of the Brady standards is to look how the outcome would have been different. And I submit that he may not have even testified if we were able to significantly impeach Mr. Torres, because then you would have two problems in the case. Let's suppose you were able to impeach Mr. Torres' credibility. The government's likely response is to go get another fingerprint expert, other than Mr. Torres. But you haven't really put the you're just pushing the putting the government to its proof, right? You're not really disputing that the two fingerprints match. You have to write your own expert in, though. You have to look at what would happen in this proceeding. Yes, maybe if they had to disclose this, they wouldn't have called Mr. Torres at all. But that's affecting the outcome of the proceeding. Sure. I understand. I mean, this would be substantial disruption to the government's case, and I think they'd be very embarrassed if you came in and you haven't denied that those you have disputed that the that the fingerprints match. But the question is, is how the testimony would have would have affected this exact proceeding. And regardless of whether or not they could have called someone else at a different time. I don't I don't have a case to tell you that right now, but I believe you just have to look at these proceedings, not what witnesses they could have called at another time. Why isn't this better brought as a 2255? Well, basically, because under Blanco, it looks like under. No, that's Bracey. Bracey, which says when you are informed of a Brady violation while the case is still pending, it is proper to do it on a direct appeal. And if you read that in conjunction with Blanco, it says we see a problem. Let's have the district court deal with it now. Why wait till these proceedings are over and then make us go back into a district court and possibly have a different district court that handled the file due to the 2255? It's just it seems judicial economy to have the same judge that heard the trial do it now. And there's authority for it. Well, Blanco is not a very good authority for that. For? For having that. I mean, I know I know Blanco very well. As you know, I know because I wrote it. Yes. There was an awful lot of Brady problems that showed up during the course of the trial, shows up during the cross-examination of the witness. There are lots of reasons to send that back. This Brady problem, to the extent that exists, the evidence for it starts to show up after the trial. There's nothing that went on during trial at all that even hints at the Brady problem. So this is this is not Blanco in that sense. And I that's why I misspoke at first. It's Bracey first. Then combine that that's a remedy when you don't know the full problem. Thank you. The matter is submitted. We'll go on to the next matter. U.S. versus Davis. Kelly Davis.
judges: Pregerson, W. Fletcher, Bybee